**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| QUANDRY SOLUTIONS INC. d/b/a QSI CONSULTING,<br> Plaintiff, | : <br> : <br> : <br> : | CIVIL ACTION |
| v. | : <br> : | NO.  07-097 |
| VERIFONE INC., VERIFONE TRANSPORTATION SYSTEMS INC. d/b/a TAXiTRONiC, and AMOS TAMAM,<br> Defendants. | : <br> : <br> : <br> : <br> : | |

DuBOIS, J.                                                                                APRIL 13, 2009

**M E M O R A N D U M**

**I.      INTRODUCTION**

This case arises from the breach of an alleged oral contract between plaintiff Quandry

Solutions, Inc. d/b/a QSI Consulting ("QSI") and TAXiTRONiC, Inc. ("TaxiTronic"). On

December 8, 2006, QSI filed a ten count Complaint against VeriFone Transportation Systems,

Inc. d/b/a/ TAXiTRONiC (successor company to TaxiTronic),[1] Amos Tamam (CEO and

shareholder of TaxiTronic), and Verifone, Inc. (majority shareholder of TaxiTronic), which was

removed by defendants to this Court on January 9, 2007.  By Order dated March 1, 2007, the

Court dismissed Counts Two through Nine of plaintiff's Complaint. Plaintiff's remaining claims

are as follows:

---

[1] The parties agree that the full name of defendant VeriFone Transportation Systems, Inc. is VeriFone Transportation Systems, Inc. d/b/a TAXiTRONiC ("VTS"), and the caption is amended to reflect that change. Because VTS existed as TaxiTronic at the time of the events which gave rise to the instant action and because VTS continues to do business under the registered trade name "TaxiTronic," the Court will refer to defendant VTS as "TaxiTronic" in this Memorandum.

- Count One: Breach of contract claim against defendants TaxiTronic and Tamam;
- Count Ten: Breach of implied covenant of good faith and unjust enrichment claim against defendants TaxiTronic, Tamam, and Verifone, Inc.

Defendants, in the Motion for Summary Judgment presently before the Court, now seek dismissal of these two remaining counts.

## II.    BACKGROUND

### A.  Facts

Plaintiff QSI is a Philadelphia based company which provides organizational and technological consulting services to corporate clients. TaxiTronic is a New York based corporation which specializes in taxicab fleet management. Prior to October 2005, TaxiTronic was wholly owned by Amos Tamam and Mark Altman.[2] On October 19, 2005, Tamam and Altman sold 19.9 % of their shares to VeriFone, Inc., a multinational corporation which manufactures electronic payment systems. VeriFone, Inc. subsequently acquired an additional 43.34% of TaxiTronic to become the majority shareholder. Tamam has, at all times relevant to this action, served as the CEO of TaxiTronic.

### 1.  Philadelphia Parking Authority Request for Proposals for Taxicab Project

On or about October 25, 2004, the Philadelphia Parking Authority ("PPA") issued a Request for Proposals ("RFP") on a PPA project to upgrade the technology used by taxicabs in the Philadelphia metropolitan area ("Taxicab Project"). (RFP, Ex. 7 to Defs.' Mot., at TT114.) The RFP set a December 15, 2004 deadline for proposals, which was later extended to January 2005. (Id.; Schiotis Dep. 18 (Nov. 30, 2007).)

The RFP "strongly encourage[d] the meaningful and substantial participation" of

---

[2]  Mark Altman is not a party to the instant action

Disadvantaged Business Enterprises ("DBEs")[3] and instructed bidders to "actively seek qualified [DBEs] to participate in [the] Request for Proposals." (RFP at TT119.) In addition to encouraging DBE participation, the RFP set goal ranges for participation. (Id.) For "[t]raining, software technology, value added resellers," the RFP suggested 15%-20% M-DBE participation, 10%-15% W-DBE participation, and "Best Effort" DS-DBE participation. For "[i]nstallation of [h]ardware into taxicabs and PPA headquarters," the RFP suggested 20%-25% M-DBE participation, 8%-16% W-DBE participation, and "Best Effort" participation. The RFP did not, however, mandate DBE participation or state that bidders with DBE participation would be selected over bidders without DBE participation on that ground. (Id.) James Ney, the director of the PPA's Taxicab and Limousine Division, confirmed that DBE participation was a "goal" and not a "requirement" at his deposition. (Ney Dep. 13-14, 57-58 (Feb. 14, 2008).)

The RFP required each bidder to submit one of two alternative forms—either a "Solicitation for Participation" form listing the DBEs approached by the bidder or a "Request for Waiver" form. (RFP at TT119.) The RFP also contained the following warning to potential bidders: "Failure to submit a completed Solicitation For Participation Form or a Request for a Waiver may result in the rejection of your proposal." (Id.) Although the RFP did not require bidders to submit written subcontracts as part of their proposals, it notified bidders that written contracts would be required before the successful bidder could claim payment for work

_____

[3] A Disadvantaged Business Enterprise is a "for-profit small business concern . . . [t]hat is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and . . . [w]hose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it." 49 C.F.R. § 26.5. The RFP listed three kinds of DBEs: Disadvantaged Minority Business Enterprises ("M-DBE"), Disadvantaged Women Business Enterprises ("W-DBE"), and Disadvantaged Disabled Business Enterprises ("DS-DBE"). (RFP at TT119.) QSI is a Philadelphia certified and registered M-DBE. (QSI Consulting's Implementation Plan ("Implementation Plan") at 2.)

performed by any DBE participants. (Id.)

At Appendix C, the RFP listed the names and contact information of companies that had already expressed an interest in the Taxicab Project. TaxiTronic was one of eighteen companies on the list. (RFP at TT136.)

### 2. QSI - TaxiTronic Communications Between October 25, 2004 and January 5, 2005

In late 2004, TaxiTronic prepared its bid for the Taxicab Project. William Schiotis, a TaxiTronic employee,[4] was responsible for preparing TaxiTronic's bid and coordinating the company's efforts to obtain the PPA contract. (Schiotis Dep. 10-11; Defs.' Mot. 5.) According to Schiotis, "numerous" DBEs contacted TaxiTronic during the proposal-development stage about collaborating on the Taxicab Project. On instructions from Tamam, Schiotis did "due diligence" on two possible DBE participants, one of which was QSI. (Schiotis Dep. 13-15; Tamam Dep. 32.) Schiotis made contact with James Jones, the CEO of QSI, and reported his initial assessment—that "QSI Consulting had the abilities and previous experience with working in the City of Philadelphia in these types of integrations of automation"—to Tamam who authorized further discussions. (Schiotis Dep. 15.)

On or about November 16, 2004, QSI and TaxiTronic entered into a Confidentiality and Nondisclosure Agreement ("NDA"), signed by James Jones for QSI and William Schiotis for TaxiTronic. The purpose of the NDA was to facilitate the exchange of confidential information "in connection with the possible establishment of a business relationship." (NDA, Ex. G to Pl.'s

---

[4] At his deposition, Tamam stated that Schiotis's position at TaxiTronic was "VP marketing and sales." (Tamam Dep. 26.) Schiotis, at his deposition, stated that he held the title of "sales representative" and never held the title "vice president - marketing and operations." (Schiotis Dep. 10-11.) On one document, however, Schiotis held himself out as TaxiTronic's "Director of Marketing." (NDA at 3.) The Court concludes that Schiotis's position at TaxiTronic is not material to the issues before the Court as the parties do not argue any questions of apparent or actual authority.

Resp., at 1.) The NDA further stated that "[i]t is understood that this Agreement does not obligate either Party to enter into any further agreements or to proceed with the [Taxicab] Project or any other possible relationship or other transaction." (NDA ¶ 4.) When asked at his deposition to name who drafted the NDA, Jones stated, "[It] looks like one of my documents, my Non-Disclosure Agreements." (Jones Dep. 74.) Jones also confirmed that the fax headers on the NDA suggest that it was sent to TaxiTronic on November 17, 2004 and sent from TaxiTronic on November 19, 2004. (Jones Dep. 74; NDA.)

The discussions between QSI and TaxiTronic began sometime in or around November 2004 and continued into 2005. Variously participating in the discussions, which took place by telephone, in person, and by email, were Tamam, Schiotis, Jones, and several QSI employees. (Jones Dep. 50-51, 60-61, 65, 77-78; Schiotis Dep. 15-16; Tamam Dep. 32-33.) Neither party states, with any specificity, what was said during these discussions. The parties agree, however, that they discussed (1) a TaxiTronic - QSI partnership with regard to the Taxicab Project and (2) the RFP's goal ranges for M-DBE participation in the Taxicab Project. (Jones Dep. 50-51; Schiotis Dep. 15-17; Tamam Dep. 39.) As a result of the discussions during this time period, TaxiTronic included information about QSI in its bid for the Taxicab Project. (Jones Dep. 64; Schiotis Dep. 17-18.)

### 3. Submission and Promotion of TaxiTronic Bid to PPA – January 5, 2005 to September 27, 2005

On or about January 6, 2005, TaxiTronic submitted its bid to the PPA. (TaxiTronic Proposal to Furnish and Install Upgraded Technologies in Philadelphia Cabs ("TaxiTronic Proposal"), Ex. 10 to Defs.' Mot., at Attach. B..) The total bid amount for TaxiTronic's proposal was $1,525,300. (TaxiTronic Proposal 44.) According to Jones, QSI did not participate in the drafting of the TaxiTronic bid. (Jones Dep. 100-01.)

Per the instructions of the RFP, TaxiTronic included a Solicitation for Participation and Commitment Form ("SPC Form") with its bid. (TaxiTronic Proposal at Attach. B.) The SPC Form listed a single DBE—QSI—and reported QSI's "Type of Work or Materials" to be "Software Development, Implementation, Service, and Training."  (Id.) The form set the level of QSI's participation at fifteen percent (15%) of the total bid which amounted to $240,000. (Id.)

Aside from the SPC Form, QSI is not mentioned in TaxiTronic's bid to the PPA. At some point after submission, however, TaxiTronic responded to several vendor-specific questions posed by the PPA, one of which concerned the status of the TaxiTronic-QSI relationship. (Vendor Specific Question Responses, Ex. K to Pl.'s Resp.) The question and response are as follows:

> Q:  What is the status of your relationship with an MBE/DBE? What is the function of this subcontractor in the project?
> A:  Our subcontractor, QSI, is currently a Philadelphia certified MBE, and has performed similar functions for other agencies within the City of Philadelphia. Further, recently QSI received their SBA 8(a) certification which will be valid though 2014. We have an agreement with QSI to provide augmented software development, training, customization, testing, and implementation services for our proposed system. Upon contract award, TAXiTRONiC will enter into an agreement w/the subcontractor for these services.

(Id.)

Following the submission of TaxiTronic's bid to the PPA, TaxiTronic and QSI continued to communicate with each other and with the PPA. (Jones Dep. 102-03.) On June 28, 2005, TaxiTronic presented "a demonstration of the Taxitronic system for the [PPA]," at which Jones was present as the "stated minority business enterprise" to explain "[t]he support services that he would be rendering [and] what his previous experience in the Philadelphia environment was." (Schiotis Dep. 25-26.) According to Jones, QSI also participated in several other meetings with the PPA and "contacted people . . . on the [PPA] selection panel to try to help to persuade them

in understanding that Taxitronic would be the best fit for [the Taxicab Project.]" (Jones at 102,

122, 128-29, 132.)

**4. PPA's Conditional Award to TaxiTronic & Termination of TaxiTronic-QSI Relationship**

On September 27, 2005, the PPA conditionally awarded the Taxicab Project to

TaxiTronic, contingent on successful negotiation of a final contract between TaxiTronic and the

PPA. (Letter from Serena Blanco, PPA Manager of Contract Administration, to Amos Tamam

(Sept. 27, 2005), Ex. 13 to Defs.' Mot.) After TaxiTronic received the conditional award, Tamam

"wanted [Jones's] proposal for what [QSI was] going to do and how much [it was] going to

cost." (Schiotis Dep. 42-43.) According to Schiotos, Tamam was "pushing very hard . . . for

numbers from [Jones]." (Id. at 42.) Around the same time, Schiotis shifted his workload to a

different TaxiTronic project and stopped participating in the conversations between TaxiTronic

and QSI. (Id. at 44.) Soon thereafter, he left TaxiTronic. (Schiotis Dep. 45-46; Tamam Dep. 26.)

QSI submitted an "Implementation Plan" to TaxiTronic on October 31, 2005. (QSI

Consulting's Implementation Plan – TAXiTRONiC-PPA Taxi Technology Project

("Implementation Plan"), Ex. 14 to Defs.' Mot., at 2.) The executive summary of the plan states:

> QSI Consulting Services is pleased to present TAXiTRONiC with this
> implementation plan and budget estimate for QSI services for the planned
> TAXiTRONiC Philadelphia Parking Authority project. This document is a written
> confirmation of QSI's current understanding of your requirements and outlines our
> approach in partnering with TAXiTRONiC. This budget and planning estimate is
> valid for 30 days from the date of this proposal.

(Id. at 2, 3.) The Implementation Plan addresses three primary topics—project management

(pages 5-8), information technology (pages 9-10), and training (pages 11-12). (Id. at 5-12.) QSI's

cost proposal for its services amounted to $1.9 million. (Id. at 16.)

According to Tamam, the Implementation Plan was "[o]ut of range and out of any business sense" because the price quoted by QSI for its portion of the project ($1.9M) was more than the bid amount for the whole project ($1.5M). (Tamam Dep. 43-44.) Tamam spoke with Jones over the telephone and told Jones that TaxiTronic could not accept QSI's Implementation Plan. Tamam instead offered Jones a subcontracted position as the field project manager for the Taxicab Project with a salary of approximately $70,000 or $80,000. (Tamam Dep. 44-45, 97; Jones Dep. 173-75.) Jones declined Tamam's offer. (Tamam Dep. 45; Jones Dep. 174.) At this point, in November 2005, QSI's involvement with the Taxicab Project ended. (Tamam Dep. 97; Jones Dep. 83, 174.)

TaxiTronic and the PPA signed a final agreement on January 31, 2006. (Taxicab System Agreement, Ex. 1 to Defs.' Mot., at 1, 39.) At the time the contract was executed, the PPA was aware that QSI, TaxiTronic's purported minority business partner, was no longer involved in the Taxicab Project. (Ney Dep. 62.)

### B.  Procedural History

Plaintiff filed its Complaint against TaxiTronic, Tamam, and Verifone, Inc. on December 8, 2006 in the Court of Common Pleas, Philadelphia County. Defendants removed the case to this Court on January 9, 2007 pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441(a)-(b). By Memorandum and Order dated March 1, 2007, the Court dismissed Counts Two through Nine of plaintiff's Complaint. All Counts other than Count Seven were dismissed with prejudice, and plaintiff did not seek to file an Amended Complaint with regard to Count Seven.

On April 11, 2008, defendants filed the instant Motion for Summary Judgment seeking the dismissal of plaintiff's remaining claims, Counts One and Ten of the Complaint. In the motion, defendants argue that plaintiff has failed to adduce sufficient evidence (1) that

defendants Tamam and Verifone, Inc. should be held personally liable for any alleged contract between TaxiTronic and QSI; (2) that TaxiTronic and QSI formed an oral subcontract with regard to the Taxicab Project; (3) that TaxiTronic and QSI formed an oral teaming agreement with regard to the Taxicab Project; and (4) that any of the defendants were unjustly enriched at plaintiff's expense.

On December 11, 2008, the parties having fully briefed the pending motion for summary judgment and following unsuccessful settlement negotiations before Chief Magistrate Judge Thomas J. Rueter, plaintiff sought leave to amend its Complaint to more specifically aver the existence of a teaming agreement. Defendants opposed plaintiff's motion to amend but agreed that plaintiff's Complaint could be construed as alleging facts in support of a teaming agreement. By Order dated January 5, 2009, the Court denied plaintiff's motion for leave, noting those paragraphs of the Complaint which supported a teaming agreement theory, and ordered plaintiff to submit supplemental briefing on the law applicable to teaming agreements.

On consideration of the five briefs and numerous supporting exhibits filed by the parties, the Court concludes that defendants' Motion for Summary Judgment should be granted and judgment entered in favor of defendants and against plaintiff.

## III.    LEGAL STANDARD

A court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A factual dispute is material when it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Id. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Id. at 249-250 (citations omitted).

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). However, the party opposing the motion cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (quoting First Nat'l Bank of Az. v. Cities Service Co., 391 U.S. 253, 288-89 (1968)).

## IV.    DISCUSSION

Under Pennsylvania law, "where the facts are in dispute, the question of whether a contract was formed is for the jury to decide." Ingrassia Constr. Co. v. Walsh, 486 A.2d 478, 482 (Pa. Super. Ct. 1984). However, "[t]he question of whether an undisputed set of facts establishes a contract is a matter of law." Mountain Props., Inc. v. Tyler Hill Realty Corp., 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001). This well-established principle becomes muddied in the context of oral contracts where "what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact for the jury." Soloman v. Luria, 246 A.2d 435, 438 (Pa. Super. Ct. 1968) (emphasis added); accord GMH Assocs., Inc. v. Prudential Realty Group, 752 A.2d 889, 898 (Pa. Super. Ct. 2000). Because the intent of the parties to be bound is an essential element of contract formation, oral contracts make it

-10-

particularly difficult to extricate the matters of law from the questions of fact.

Nevertheless, the allegation that an oral contract exists does not automatically entitle a plaintiff to a jury trial. In this case, plaintiff has not disputed the evidence presented by defendants in their motion for summary judgment. Similarly, defendants do not attempt to contradict what little evidence plaintiff provides in its responsive memorandum. The underlying facts of what occurred during the critical period between November 2004 and November 2005 are not in dispute. Thus, the Court must determine whether a reasonable jury, reviewing the undisputed facts presented by the parties, could find that the parties formed an oral contract. That inquiry is not affected by the rule that the formation of an oral contract is ordinarily a question of fact for the jury. See GMH Assocs., 752 A.2d at 898-99 (acknowledging that "what was said and done by the parties as well as what was intended by what was said and done by them are questions of fact," but nevertheless assessing whether an oral contract was formed as a matter of law).

An additional complicating factor in this case is the burden of proof to be applied to plaintiff's claims. Defendants assert that the burden of proof under Pennsylvania law for oral contracts is "clear, direct and precise evidence." (Defs.' Mot. 18 (citing Gregg v. Lindsay, 649 A.2d 935, 940 (Pa. Super. Ct. 1994) & Martin v. Safeguard Scientifics, Inc., 17 F. Supp. 2d 357, 368 (E.D. Pa. 1998)).) Because a court ruling on a motion for summary judgment must evaluate the evidence in light of the burden of proof to be applied at trial, Anderson, 477 U.S. at 252, defendants' assertion carries significant consequences.  Although plaintiff has not challenged the "clear, direct and precise" standard, this Court concludes that it would be error to impose a burden of proof other than preponderance of the evidence in this case. See Zielonka v. Temple Univ., No. 99-civ-5693, 2001 WL 1231746, at *9 (E.D. Pa. Oct. 12, 2001); Robert Billet

Promotions, Inc. v. IMI Cornelius, Inc., No. 95-civ-1376, 1998 WL 721081, at *13 (E.D. Pa. Oct. 14, 1998); cf. Pinizzotto v. Parsons Brinkerhoff Quade & Douglas, Inc., 697 F. Supp. 886, 886-88 (E.D. Pa.1988); In re Trust Estate of A. Warren Kelsey, 24 Phila. Co. Rptr. 84, 92-93 (Pa. Ct. Com. Pl. 1992).

A review of Pennsylvania authority discloses that oral contacts must, in some circumstances be proven by "clear, direct and precise" evidence. For example, an oral modification to a written contract, an oral contract to make a will, and an oral contract enforced against a decedent's estate must all be proven by a higher standard than preponderance of the evidence. See Robert Billet Promotions, 1998 WL 721081, at *13; see, e.g., Gregg v. Lindsay, 649 A.2d 935, 940 (Pa. Super. Ct. 1994) (oral contract to make a will); Hatbob v. Brown, 575 A.2d 607, 609, 612 (Pa. Super. Ct. 1990) (oral contract to make a will); Pellegrene v. Luther, 169 A.2d 298, 299-300 (Pa. 1961) (oral contract which modifies, changes, or cancels a prior written contract); Stafford v. Reed, 70 A.2d 345, 347-48 (Pa. 1950) (claims against a decedent's estate). However, in cases involving garden variety oral contracts, Pennsylvania courts have applied the preponderance of the evidence burden of proof. See Idell v. Falcone, 235 A.2d 394, 395-96 (Pa. 1967); Johnston the Florist, Inc. v. TEDCO Constr. Corp., 657 A.2d 511, 516 (Pa. Super. Ct. 1995); Rohbock v. McCargo, 6 Pa. Super. 134 (Super. Ct. 1897). In accordance with the above cited authority, the Court will not hold plaintiff to the higher burden of proof proposed by defendants and instead will adhere to the generally applicable preponderance of the evidence standard.

**A.  Plaintiff's Contract Claims Against Tamam and VeriFone, Inc. in Counts I and X**

Defendants argue, as a preliminary matter, that the Court should dismiss all claims against defendants Tamam and VeriFone, Inc. because the alleged agreement was between QSI

and TaxiTronic.[5] Plaintiff's complete failure to litigate this issue leaves the Court with little understanding of the basis for its claims against these defendants. Nevertheless, there are only two possibilities—either defendants Tamam and Verifone, Inc. were individual parties to the alleged contract or some justification exists for holding Tamam and Verifone, Inc. liable as shareholders of TaxiTronic.

It is well established under Pennsylvania law that "one cannot be liable for a breach of contract unless one is a party to that contract." Electron Energy Corp. v. Short, 597 A.2d 175, 177 (Pa. Super. Ct. 1991), aff'd 618 A.2d 395 (Pa. 1993) (citing Viso v. Werner, 369 A.2d 1185 (Pa. 1977)). When a corporation enters into a contract, the corporation alone is liable. "'[W]henever a corporation makes a contract, it is the contract of the legal entity of the artificial being created by the [corporate] charter, and not the contract of the individual members.' Thus, the breach of the contract is the breach of a promise made by the corporation, and not the breach of any promise extended by the corporate officer." Loeffler v. McShane, 539 A.2d 876, 879 (Pa. Super. Ct. 1988) (quoting Bala Corp. v. McGlinn, 144 A. 823, 824 (Pa. 1929)). The uncontroverted evidence demonstrates that neither Tamam nor Verifone, Inc., in their individual capacities, made any promises to QSI with regard to the Taxicab Project. (Defs.' Mot. 3-4; Jones Dep. 90-97.) Because Tamam and Verifone, Inc. were not parties to the alleged contract, they can not be liable for any breach of contract on that ground.

In certain circumstances, courts may pierce the corporate veil and hold owners and

_____

[5] The Court notes that while defendant Tamam is a party to both Counts One and Ten, defendant Verifone, Inc. is only named as a defendant in Count Ten. To the extent that plaintiff seeks to recover against either of those defendants on the alleged contract (i.e., under the breach of contract claim in Count One or the beach of implied covenant of good faith claim in Count Ten), the claims are dismissed for the reasons stated in this Part of the Memorandum. Plaintiff's unjust enrichment claims against defendants Tamam and VeriFone, Inc. are discussed in Part IV.E of this Memorandum.

shareholders of a corporation liable for the debts of the corporation. In Pennsylvania, "there is a strong presumption . . . against piercing the corporate veil." Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995). Such action should only be contemplated where factors such as "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud" demonstrate that piercing the corporate veil is necessary to "prevent fraud, illegality, or injustice, or [because] recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." Zubik v. Zubik, 384 F.2d 267, 272-73 (3d Cir. 1967); Lumax, 669 A.2d at 895 (quoting Kaites v. Dep't of Envtl. Res., 529 A.2d 1148, 1151 (Pa. Commw. Ct. 1987)); Sams v. Redev. Auth. of New Kensington, 244 A.2d 779, 781 (Pa. 1968).

Plaintiff's statements that "there is a distinct appearance that Amos Tamam and [TaxiTronic] are each other's alter ego" and that "[Tamam's] decisions, while attempting to contract with the PPA were, at times, personal in nature" without any citation to evidence or legal authority does not satisfy plaintiff's burden at the summary judgment stage. Moreover, plaintiff did not present any evidence or argument with regard to Verifone, Inc. Plaintiff has not, therefore, demonstrated that a genuine issue of material fact exists with regard to the liability of Tamam and VeriFone, Inc. for the alleged contract between TaxiTronic and QSI. Accordingly, the Court grants defendants' Motion for Summary Judgment with regard to plaintiff's contract claims against defendants Tamam and Verifone, Inc.

### B.  Plaintiff's Contract Claims Against TaxiTronic in Count I

In Count I, plaintiff asserts a breach of contract claim against TaxiTronic. In essence, plaintiff avers that on or before November 16, 2004,[6] TaxiTronic orally agreed to award QSI a

---

[6] November 16, 2004 is the date on which the parties entered into the Confidentiality and Nondisclosure Agreement. (NDA at 1.) Although plaintiff does not specify a particular day on

subcontract for a portion of the Taxicab Project. (Jones Dep. 64-65, 76-77, 125.) According to Jones, the subcontract was for "20 percent for the project [awarded by the PPA], 20 percent for the installation of hardware in taxis, and 15 percent for the value added reseller."[7] (Jones Dep. 63, 65, 79, 90, 172.) Defendants argue that no subcontract was formed, that the parties merely anticipated the negotiation of a subcontract in the future, and that plaintiff's figures simply represent the Taxicab Project's goal ranges for DBE participation.

Enforceable agreements, under Pennsylvania law, must satisfy three requirements: (1) both parties must manifest an intent to be bound by the terms of the agreement; (2) the terms must be sufficiently definite to be enforceable; and (3) the agreement must be supported by consideration. Channel Home Centers v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986) (citing Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956); Stelmack v. Glen Alden Coal Co., 14 A.2d 127 (Pa. 1940); Linnet v. Hitchcock, 471 A.2d 537, 540 (Pa. Super. Ct. 1984); Cardamone v. Univ. of Pittsburgh, 384 A.2d 1228 (Pa. Super. Ct. 1978)). In this case, the parties do not contest the issue of consideration.

Plaintiff initially characterized the agreement between QSI and TaxiTronic as a contract subject to a condition precedent—the award of the PPA contract to TaxiTronic. (Pl.'s Resp. 4.) In its later submission, plaintiff argued the alternative theory that the parties entered into a binding teaming agreement. (Pl.'s Surreply 2.). The Court will address each of these theories in

---

which the alleged subcontract was formed, plaintiff consistently claims that it was formed on or before November 16, 2004. At no point does plaintiff argue that the contract was formed after November 16, 2004.

[7] The Court notes that the evidence of record in this case states differing percentages with regard to QSI's portion of the Taxicab Project. The parties, in their summary judgment briefs, did not dispute the amount of the alleged subcontract, and in any event, the Court concludes that the amount of the alleged contract is not material to the issues before the Court. For purposes of this Memorandum, because the Court must review the record evidence in the light most favorable to plaintiff, the nonmoving party, the Court will refer to the alleged subcontract using the terms about which Jones testified at his deposition.

turn, noting however that the requirements of contract formation must be satisfied regardless of the contract theory advanced by plaintiff. See ATACS Corp. v. Trans World Commc'ns, 155 F.3d 659, 665-66 (3d Cir. 1998).

### 1.   Plaintiff's Subcontract Theory

The Court first addresses plaintiff's argument that the parties formed a subcontract subject to a condition precedent—the award of the PPA contract to TaxiTronic. In that analysis, the Court must initially determine whether a reasonable jury could find that the parties intended to be bound by the twenty-percent contract alleged by plaintiff or whether it amounts to nothing more than an informal preliminary agreement subject to further negotiations. If the parties intended to be bound, the Court must assess whether the terms of the alleged subcontract are sufficiently definite to be enforced.

### a.   Mutual Manifestation of Intent

In general, the first element of contract formation is established through evidence of offer and acceptance. Reed v. Pittsburgh Bd. of Public Educ., 862 A.2d 131, 134 (Pa. Commw. Ct. 2004); Koken v. Steinberg, 825 A.2d 723, 729 (Pa. Commw. Ct. 2003); Yarnall v. Almy, 703 A.2d 535, 538 (Pa. Super. Ct. 1997); Jenkins v. County of Schulkill, 658 A.2d 380, 383 (Pa. Super. Ct. 1995). In some circumstances, however, "[a] manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined." Restatement (Second) of Contracts § 22(2) (1981). In such cases, a contract may be implied in fact by "looking to the surrounding facts of the parties' dealings." Ingrassia Const. Co. v. Walsh, 486 A.2d 478, 483 & n.7 (Pa. Super. Ct. 1984).

"It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." Channel Home Centers,

-16-

795 F.2d at 298 (citing Goldman v. McShain, 247 A.2d 455, 458 (Pa. 1968); Lombardo, 123

A.2d at 666; Kazanjian v. New England Petroleum Corp., 480 A.2d 1153, 1157 (Pa. Super. Ct.

1984); Restatement (Second) of Contracts § 26 (1979)); Jenkins, 658 A.2d at 383-84.

Nevertheless, "where the parties have settled on the terms of an agreement, the intent to later

formalize that agreement by writing does not prevent the formation of a contract." Philmar Mid-

Atlantic v. York St. Assoc., 566 A.2d 1253, 1255 (Pa. Super. Ct. 1989) (citations omitted).

      Plaintiff argues that an oral subcontract was formed on or before November 16, 2004 for

the work that QSI would perform under the TaxiTronic's prime contract with the PPA. (Compl.

¶ 51; Jones Dep. 64-65, 76-77, 125.) In arguing that QSI and TaxiTronic formed a binding

subcontract, plaintiff states, without citation to the record, that "[a]n offer was made by

Defendants and accepted by plaintiff." (Pl.'s Resp. 4.) In fact, Jones, at his deposition, pointed to

no explicit offer or acceptance, but to general discussions between the parties concerning the

possibility of partnering with regard to the Taxicab Project. (Jones Dep. 76-77.) The Court must,

therefore, evaluate the undisputed conduct and representations of the parties to determine

whether they formed a contract implied in fact.

      In support of the theory that a subcontract was formed on or before November 16, 2004,

plaintiff relies on various undisputed facts. The Court reviews, one by one, the facts cited by

plaintiff to determine whether they, individually, suggest the existence of a mutual manifestation

of intent to enter into a binding subcontract. The Court then revisits those facts in light of the

other undisputed conduct of the parties.

      First, plaintiff points to the deposition testimony of William Schiotis, a representative of

TaxiTronic, with regard to the initial meetings between QSI and TaxiTronic at the end of 2004:

> Q:  Was there just one meeting [between QSI and TaxiTronic] or was it two
> meetings?

A:  If my memory serves me we did have two meetings. Also, if I remember correctly, we agreed that when the RFP was submitted and we had more information as to what the scope and nature of the work would be we would provide that information to QSI Consulting and *QSI Consulting in turn would provide a proposal for that portion of the contract that they would be inheriting*.

Q:  At that time what did "inheriting" mean to you?

A:  That was probably the wrong choice of words but that portion of the contract that we previously discussed needed to be assigned to a minority business or a woman-owned business enterprise and I believe it was to be 15 percent of the value and QSI was going to perform installations, provide personnel, do some training and I believe it was to be some ongoing support, like troubleshooting and that kind of thing.

Q:  Now you indicated that 15 percent of the value was what you perceived the contract to be at that time?

[defense counsel objects to form]

A:  We didn't know the value of the contract. In order to respond [to the RFP] and to have a bid that was considered compliant we had to identify who our M-DBE-certified subcontractor was, what their references were and we had to sign an agreement as part of our submittal stating that we would be meeting that 15 percent requirement, whatever that 15 percent turned out to be.

(Schiotis Dep. 16-17 (emphasis added).) Jones, at his deposition, asserted a substantially similar

understanding of the 2004 meetings. (Jones Dep. 62-63.)

Plaintiff argues that Schiotis's testimony "definitively present[s] the offer to Plaintiff,"

but it does not. (Pl.'s Resp. 4.) To the contrary, the deposition testimony contradicts plaintiff's

assertion that the parties formed a subcontract during their initial meetings. Specifically, Schiotis

states that QSI would submit a "proposal for that portion of the contract that they would be

inheriting" as the stated DBE participant. At most, Schiotis's testimony establishes that the

parties expected QSI to be a subcontractor on the Taxicab Project subject to the submission and

acceptance of a proposal by QSI.

Second, plaintiff states that plaintiff "was the sole qualified MBE to fulfill the contract,"

and that the PPA "anticipated the use of local minority, disabled or women owned business

enterprises." (Pl.'s Resp. 6, 11.) While defendants do not dispute that QSI was the only DBE that

-18-

TaxiTronic seriously considered as a potential partner on the Taxicab Project or that the PPA strongly encouraged DBE participation, they do present uncontroverted evidence that the minority participation goals were just that—goals. The PPA did not require minority participation and the PPA signed a final agreement with TaxiTronic despite the absence of a DBE subcontractor. (RFP at TT119; Ney Dep. 57-58, 62.) The DBE participation goals do not, therefore, speak to the question of whether the parties intended to be bound.

Third, plaintiff refers the Court to the NDA executed on November 16, 2004 as a common tool for "bringing a subcontractor into an agreement." (Pl.'s Resp. 7.) Again, the text of the NDA specifically undermines plaintiff's attempt to use it as evidence that the parties formed a contract on or before November 16, 2004. The NDA concerns the parties' use of mutually exchanged information "in connection with the *possible* establishment of a business relationship." (NDA at 1 (emphasis added).) In addition, the NDA states that "this Agreement does not obligate either Party to enter into any further agreements or to proceed with the Project or any other possible relationship or other transaction." (NDA at 2.) Even assuming that the NDA was not drafted by counsel, as plaintiff claims, the NDA's references to "possible" relationships and "further" agreements do not provide support for plaintiff's assertion that a contract was formed during the period immediately preceding the execution of the NDA.

Fourth, plaintiff argues that QSI's participation TaxiTronic's June 29, 2005 presentation to the PPA strongly suggests the existence of an agreement. Plaintiff states that "[i]t is unlikely in the extreme that Plaintiff would have been permitted to participate in the demonstration unless it were, indeed[,] partnered with the primary contractor." (Pl.'s Resp. 8.) The Court does not agree that plaintiff's participation in the PPA presentation leads to the conclusion that a binding subcontract existed. Defendants do not contest that there was some relationship between the

parties or that they were "partnered." The fact that QSI participated in TaxiTronic's bid for the

Taxicab Project does not mean, however, that the parties were bound by an enforceable

subcontract.

Finally, plaintiff quotes the language used by TaxiTronic in its Vendor Specific Question

Responses to describe the relationship between TaxiTronic and QSI. TaxiTronic refers to QSI as

"[o]ur subcontractor" and states that "[w]e have an agreement with QSI to provide software

development, training, customization, testing, and implementation services . . . ." (Vendor

Specific Question Responses.) With this document, plaintiff musters some circumstantial

evidence that TaxiTronic manifested its assent to the subcontract alleged by plaintiff.

Nevertheless, the Vendor Specific Question Responses is, itself, internally contradictory. It states

both that TaxiTronic "ha[s] an agreement with QSI" and that TaxiTronic "will enter into an

agreement" with QSI. (Id.) Logically, these statements demonstrate not that the parties had

formed a final subcontract, but that the parties had agreed in principle to the negotiation of a final

subcontract. In any event, TaxiTronic's statement to the PPA cannot satisfy the "mutual

manifestation of intent" requirement of contract formation, in as much as it was only designed to

provide information to the PPA and not to define the relationship between TaxiTronic and QSI.

Plaintiff's facts, however inconclusive, do not stand alone and should not be considered

in isolation. The undisputed facts of this case, viewed in the light most favorable to plaintiff,

demonstrate that QSI and TaxiTronic agreed to something. After all, TaxiTronic and QSI

willingly collaborated throughout the PPA bid process. At the very least, they agreed to that

collaboration. Plaintiff argues that the parties agreed to more, that the "contract was a simple

agreement" whereby QSI would perform, and be compensated for, twenty percent of the prime

contract. (Pl.'s Resp. 11.) Simple agreements are certainly enforceable where the parties intend to

be bound by them.

In this case, however, plaintiff has presented no evidence that defendants agreed to the "terms" of the "simple agreement" as anything more than a starting point for negotiations. The "terms" identified by plaintiff are no more than the RFP's goal ranges for DBE participation. They set forth the scope and subject matter of QSI's expected role in the Taxicab Project. Although the evidence demonstrates that TaxiTronic adopted these goal ranges for the purposes of the bid process, plaintiff has presented no evidence that TaxiTronic agreed to be bound by those goal ranges. Further, other undisputed evidence summarized below establishes that the parties did not intend to be bound.

Both TaxiTronic and QSI knew that they would, at some point, have to formalize their agreement in writing because the RFP required signed DBE subcontracts. (RFP at TT119.) Under Pennsylvania law, "a stipulation to reduce a valid [informal] contract to some other form does not affect its validity." Onyx Oils & Resins, Inc. v. Moss, 80 A.2d 815, 817 (Pa. 1951) (internal quotation marks and citation omitted). Nevertheless, where "it is in contemplation of the parties that a more formal contract shall be executed, . . . it is an essential to the enforcement of [the] informal contract that the minds of the parties should meet upon all the terms, as well as the subject-matter, of the contract; and, *if anything is left open for future consideration, the informal [agreement] cannot form the basis of a binding contract*. Id. (emphasis added) (informal written contract); see also GMH Assocs., Inc. v. Prudential Realty Group, 752 A.2d 889, 900 (Pa. Super. Ct. 2000) (informal oral contract). Jones, at his deposition, repeatedly stated that the details of the subcontract were to be worked out after November 16, 2004. (Jones Dep. 60, 81, 139-40.) This contemplation of future negotiations prior to the execution of a formal contract is strong evidence that the parties did not intend to be bound by any preliminary agreement.

In addition, the language of the NDA executed on November 16, 2004 and the "proposal" submitted by QSI on October 31, 2005, the only written documents exchanged by TaxiTronic and QSI in the record before the Court, weigh against the existence of plaintiff's alleged subcontract. Both documents refer to the agreement between QSI and TaxiTronic as a future matter. Neither refers to any extant agreement between the parties. The parties' behavior during the bid process, likewise, does not demonstrate that they were operating under a binding subcontract, but only that they were both seeking future contracts with the PPA and with each other.

The first question that the Court addressed in determining whether the parties formed a subcontract subject to a condition precedent is whether the parties intended to be bound by the twenty-percent agreement alleged by plaintiff. For all the foregoing reasons, the Court concludes that plaintiff has not presented sufficient evidence to create a genuine issue of material fact with regard to the intent of the parties to be bound.  For this reason alone, plaintiff's subcontract claim fails as a matter of law.

### b.  Sufficiently Definite Essential Terms

Under Pennsylvania law, "in order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain." Lombardo, 123 A.2d at 666. Although an agreement need not contain all of the terms necessary for the execution of the agreement, it must "represent a meeting of the parties' minds on the essential terms of their agreement." Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd., 426 A.2d 1152, 1154-55 (Pa. Super. Ct. 1981). The essential terms of a contract under Lombardo include the time and manner of performance and price or other consideration. Lombardo, 123 A.2d at 666; Lackner v. Glosser, 892 A.2d 21, 31 (Pa. Super. Ct.

2006); Commonwealth v. On-Point Tech. Sys., Inc., 821 A.2d 641, 648 n.12 (Pa. Commw. Ct.

2003), aff'd 870 A.2d 873 (Pa. 2005).

In this case, even if the Court were to conclude that the parties did agree to the

subcontract alleged by plaintiff—one where QSI would receive twenty percent of the value of the

Taxicab Project in return for hardware installation, training, and related services—such terms are

not "sufficiently definite to be enforceable." The "terms" supplied by plaintiff state no more than

the subject matter of the subcontract. The Court, much like the PPA and defendants, cannot

surmise what specific services were to be provided by QSI under the subcontract or the time and

manner of performance. (Tamam Dep. 39, 43; Ney Dep. 20, 35, 48, 53-55.) Despite numerous

opportunities to clarify the terms of QSI's performance during his deposition, Jones could not

specify any details concerning QSI's obligations under the alleged subcontract. (Jones Dep. 60,

80-81, 100, 139-41.) The "Implementation Plan" proposed by QSI fails to provide additional

clarity because it focuses on generalizations and goals. (Implementation Plan.) Without concrete

details, the alleged subcontract between the parties lacks essential terms for enforcement, or at

the very least, fails to define the obligations of the parties with sufficient certainty.

Similarly, the price term alleged by plaintiff suffers from indefiniteness. Jones stated at

his deposition that QSI was to receive "20 percent for the project [awarded by the PPA], 20

percent for the installation of hardware in taxis, and 15 percent for the value added reseller."

(Jones Dep. 63, 65, 79, 90, 172, 174.) Jones did not, however, explain how these figures relate to

one another, whether they are cumulative, what any of the work performed would actually be

worth, or how the $ 1.9 million figure of QSI's Implementation Plan relates to these percentages.

(Jones Dep. 63, 65, 79, 90, 168-72, 174.) Under such circumstances, there is no basis for

determining the contract price.

Even assuming, *arguendo*, that the parties intended to be bound by the alleged twenty-percent agreement, plaintiff must establish that the terms of the contract are sufficiently definite to be enforced. For all of the foregoing reasons, the Court concludes that the terms of the contract alleged by plaintiff fail to meet the requirements for enforceable contracts under Pennsylvania law as they are not sufficiently definite to be enforced.

### 2.   Breach of Teaming Agreement

Having determined that the undisputed facts fail to create a genuine issue of material fact with regard to the formation of a subcontract prior to November 16, 2004 and that no such subcontract was formed as a matter of law, the Court must evaluate whether the same facts could establish by a preponderance of the evidence that the parties formed a binding teaming agreement. In ATACS Corp. v. Trans World Communications, 155 F.3d 659, 667 (3d Cir. 1998), the Third Circuit predicted that Pennsylvania law would recognize the validity of teaming agreements as enforceable contracts. ATACS provides a thorough description of teaming agreements and the conditions under which they become enforceable. A portion of this description is excerpted below to guide this Court's discussion of these issues.

> . . . . Typically, a teaming agreement is an arrangement whereby a subcontractor will "team" with a company intending to bid on a government contract as a prime contractor in order to pool financial and technical resources. . . . In many cases, the finalized subcontract between the parties to a teaming agreement will specifically enumerate the scope of the obligations for each party contingent upon the prime contractor winning the [prime contract] so that there is usually little need to enforce the teaming arrangement itself. Often, however, the parties may reach an understanding to team, but fail to execute a subcontract as anticipated in the teaming agreement. As with most other "preliminary agreements" precedent to an executed contract, the question arises whether the teaming agreement itself, absent an executed subcontract, may constitute the basis for contractual liability.
> . . . . With teaming agreements, courts are particularly sensitive to what the parties intended in agreeing to "team"—that is, *searching for sufficiently definite terms for enforcement other than the simple promise to enter into a subcontract at a later date*—and whether that teaming agreement was intended to bind the

parties during the various stages of government contract procurement.
The fact that the parties never finalized an implementing subcontract is usually not fatal to enforcing the teaming agreement on its own—if the parties intended the teaming agreement itself to constitute a binding agreement that enumerated definite terms of behavior governing the parties during, or even after, the bidding process.

ATACS, 155 F.3d at 666-67 (emphasis added) (citations omitted).

As ATACS states, the teaming agreement must be more than a "simple promise to enter into a subcontract at a later date," a concept that defendants frequently refer to as a non-binding "agreement to agree." Where the teaming agreement does not include the mutually agreed upon and definite terms of the ultimate subcontract, the subcontract cannot be enforced. Id.; Trianco, LLC v. Int'l Bus. Machines Corp., 271 F. App'x 198, 202 (3d Cir. 2008) (applying New York law). Where, however, the teaming agreement provides for other obligations between the parties and those obligations are sufficiently definite and mutually agreed upon, they can be enforced independent of any unenforceable subcontract. ATACS, 155 F.3d at 667.

Teaming agreement obligations could include an agreement to negotiate in good faith or an agreement to negotiate exclusively. ATACS, 155 F.3d at 668 (affirming the district court holding that the parties agreed to "good faith and exclusive negotiations . . . toward executing a subcontract"); Channel Home Centers, 795 F.2d at 299 (predicting that Pennsylvania law would recognize the validity of an agreement to negotiate in good faith); Jenkins, 658 A.2d at 384-85 (describing standards for an agreement to negotiate in good faith); see also Trianco, LLC v. Int'l Bus. Machines Corp., 466 F. Supp. 2d 600, 607 (E.D. Pa. 2006), vacated on other grounds, 271 F. App'x 198 (3d Cir. 2008) (applying New York law). Indeed, parties could also agree that a potential subcontractor be compensated for efforts undertaken during the bid process in the event that the parties do not reach a final subcontract. All such agreements must, however, satisfy the basic requirements of contract formation, as described above.

Jones, at his deposition, describes the terms of the alleged teaming agreement as follows: "If QSI were to assist Taxitronic to help them to get this contract from the [PPA], then we would be rewarded by 20 percent of the project, 20 percent for the installation of the hardware, and [15] percent for the . . . value added reseller." (Jones Dep. 79.) Later, he stated, "[m]y role was to help [TaxiTronic] to get the [PPA] contract by attending the meetings, making presentations, and helping to persuade some of the other people around the table to make the contract award to Taxitronic." (Jones Dep. 82.)

As these statements demonstrate, plaintiff has alleged exactly what <u>ATACS</u> holds insufficient: "the simple promise to enter into a subcontract at a later date." An unenforceable subcontract cannot be the basis for an enforceable teaming agreement. Thus, plaintiff's allegation that the parties exchanged QSI's support during the bid process for TaxiTronic's promise to award a subcontract fails. This conclusion is aligned with the rulings of other courts that have considered similar claims. <u>See</u> <u>Trianco</u>, 466 F.Supp.2d at 605-06; <u>Ulliman Schutte Constr., LLC v. Emerson Process Mgmt. Power & Water Solutions</u>, No. 02-civ-1987, 2006 WL 1102838 (D.D.C. Mar. 31, 2006) (applying Pennsylvania law); <u>ABT Assocs., Inc. v. JHPIEGO Corp.</u>, 104 F. Supp. 2d 523 (D. Md. 2000), <u>aff'd</u> 9 F. App'x 172 (4th Cir. 2001) (per curiam).

In its surreply, plaintiff attempts to analogize the facts of <u>ATACS</u> to the facts of this case.[8] (Pl.'s Surreply 8-12.) Plaintiff also characterizes the teaming agreement in <u>ATACS</u> as "an essentially verbal understanding." (Pl.'s Surreply 9.) Plaintiff's arguments fail, however, to appreciate the ultimate conclusion of the Third Circuit that no subcontract existed and that the

---

[8] The Court notes that plaintiff represents certain facts to the court without record citations. The Court will not rely on such statements and notes that some of them are specifically contradicted by the record. For example, plaintiff states that QSI "immediately began work on software" after the alleged verbal agreement was formed. (Pl.'s Surreply 9.) Jones stated at his deposition, however, that QSI did not develop software for TaxiTronic because TaxiTronic had its own. (Jones Dep. 80-81.)

only terms of the teaming agreement that could be enforced were those that were clearly expressed in *written* communications and sufficiently definite to be enforced—the exchange of ATACS's assistance during the bid process for exclusive good faith negotiations. ATACS, 155 F.3d at 662-63, 668.

Plaintiff has neither alleged nor presented any evidence that the parties agreed to a teaming agreement whereby QSI would support TaxiTronic's bid to obtain the PPA contract in return for TaxiTronic's pledge to negotiate a subcontract in good faith. Further, no obligation to negotiate in good faith exists as a matter of law.[9] See Channel Home Centers, 795 F.2d at 299 (construing a written letter of intent to negotiate in good faith); Jenkins, 658 A.2d at 385 (same). Alternatively, plaintiff's Complaint alleges that TaxiTronic agreed to compensate QSI for services performed during the bid process in the event that a contract was not awarded (Compl. ¶¶ 55-56). However, plaintiff has neither argued this point nor provided any evidence of such an agreement. Accordingly, the Court concludes that plaintiff's teaming agreement arguments lack merit.

### C.  Plaintiff's Breach of Implied Covenant of Good Faith Claim Against TaxiTronic in Count X

In Pennsylvania, courts have adopted the principle that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1981); see Kaplan v. Cablevision of Pa., Inc., 671 A.2d 716, 721-22 (Pa. Super. Ct. 1996); Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992); Baker v. Lafayette Coll., 504 A.2d 247, 255 (Pa. Super. Ct. 1986), aff'd, 532 A.2d 399

---

[9] Defendants argue, in the alternative, that they satisfied any duty to negotiate in good faith by responding to QSI's $1.9 million proposal with a reasonable counteroffer. (Defs.' Mot. 32.) However, because there is no evidence that the parties agreed to negotiate in good faith, the Court need not reach the question of whether the negotiations were actually conducted in good faith.

(Pa. 1987). Although there is some difference of opinion with regard to whether every contract gives rise to an independent cause of action for breach of the implied duty of good faith and fair dealing, there is no dispute that such an action relies on the existence of a valid contract. Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91-92 (3d Cir. 2000); Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc., 246 F. Supp. 2d 394, 400-01 (E.D. Pa. 2002); Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank & Trust Co., 560 A.2d 151, 153-154 (Pa. Super. Ct. 1989); JHE, Inc. v. Se. Pa. Transp. Auth., No. 1790 of Nov. 2001, 2002 WL 1018941, at *6 (Pa. Ct. Com. Pl. May 17, 2002). In other words, unenforceable contracts do not have enforceable implied terms.

Plaintiff argues that defendants breached their duty of good faith and fair dealing by "failing to compensate plaintiff as contracted." (Pl.'s Resp. 14-15). Because plaintiff has failed to raise a genuine issue of material fact with regard to the existence of a contract, plaintiff's argument that defendants breached the implied duty of good faith and fair dealing under the contract must fail.

### D.  Plaintiff's Unjust Enrichment Claim Against TaxiTronic in Count X

In Count Ten, plaintiff raises an alternative quasi-contract claim, styled as unjust enrichment. Plaintiff, variously, bases its unjust enrichment claim on three alleged benefits conferred on defendants: (1) software, (2) efforts to promote the TaxiTronic bid for the Taxicab Project, and (3) intellectual property in the form of the Implementation Plan. (Compl. ¶ 137-38; Pl.'s Resp. 15; Jones Dep. 82-83, 183-84.) The undisputed evidence shows that QSI never provided any software to TaxiTronic and that TaxiTronic planned on using its own software for the Taxicab Project. (Mawusi Dep. 35-36 (Feb. 15, 2008); Jones Dep. 80-81; Tamam Dep. 38-39.) Thus, plaintiff's only unjust enrichment claims relate to QSI's efforts during the bid process

and QSI's Implementation Plan.

Under Pennsylvania law, "[a] quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001); accord Schott v. Westinghouse Elec. Corp., 259 A.2d 443, 449 (Pa. 1969); Lackner v. Glosser, 892 A.2d 21, 34 (Pa. Super. Ct. 2006). The elements of unjust enrichment are "[1] benefits conferred on defendant by plaintiff, [2] appreciation of such benefits by defendant, and [3] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." Styer v. Hugo, 619 A.2d 347, 350 (Pa. Super. Ct. 1993) (quotation marks and citations omitted), aff'd 637 A.2d 276 (Pa. 1994); accord AmeriPro Search, 787 A.2d at 991.

A benefit conferred, while essential, is not sufficient. "[T]he most significant element of the doctrine is whether the enrichment of the defendant is *unjust*. The doctrine does not apply simply because the defendant may have benefit[t]ed as a result of the actions of the plaintiff." Styer, 619 A.2d at 350 (emphasis in original) (citing Meehan v. Cheltenham Township, 189 A.2d 593 (Pa. 1963) & D.A. Hill Co. v. Clevetrust Realty, 573 A.2d 1005 (Pa. 1990)). "To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for [the party] to retain'" without compensation. Torchia v. Torchia, 499 A.2d 581, 582 (Pa. Super. Ct. 1985) (quoting Roman Mosaic & Tile Co. v. Vollrath, 313 A.2d 305, 307 (Pa. Super. Ct. 1973)); In Re Brereton's Estate, 130 A.2d 453, 457 (Pa. 1957) (citing Restatement (First) of Restitution § 1 (1937)).

In determining what makes a defendant's receipt of benefits unconscionable, the focus is

on the reasonable expectation of the plaintiff.  "Quantum meruit may be had when one party has a 'reasonable expectation' of payment from the other party, and it would be unconscionable— i.e., a form of unjust enrichment—for the second party to receive the benefit of the first party's services without payment. King of Prussia Equip. Corp. v. Power Curbers, Inc., 158 F. Supp. 2d 463, 467 (E.D. Pa. 2001); accord Schott, 259 A.2d at 449 (reversing lower court's dismissal of plaintiff's unjust enrichment claim because "[w]e cannot find on the facts as alleged that it was clear as a matter of law that appellant expected no payment or intended to confer a gratuity, nor . . . is it clear that the benefit was conferred officiously."); Lackner, 892 A.2d at 34 (affirming the dismissal of plaintiff's quasi contract claim at summary judgment because plaintiff did not provide any evidence concerning the basis for his expectation of compensation); Schenck v. K.E. David, LTD, 666 A.2d 327, 329 (Pa. Super. Ct. 1995) (affirming trial court's conclusion that defendants were unjustly enriched because evidence presented to the trial court indicated that plaintiff had a "reasonable expectation"of reimbursement).

### 1.   QSI's Efforts to Promote TaxiTronic's Bid

Plaintiff argues that "Defendants have been unjustly enriched in that they have failed to compensate Plaintiff for its services and its assistance in obtaining the contract award in the first place." (Pl.'s Resp. 15.) Although it is undisputed that QSI participated in the promotion of TaxiTronic's bid to the PPA, plaintiff does not explain what specific benefit was conferred on defendants or why defendants' failure to compensate plaintiff is unjust. Moreover, in support of this claim, plaintiff cites to only one case, and in that case the Superior Court of Pennsylvania affirmed the *dismissal* of the plaintiff's unjust enrichment claim. Villoresi v. Femminella, 856 A.2d 78, 84 (Pa. Super. Ct. 2004).

With regard to the first element of unjust enrichment—benefit conferred—Jones's

deposition testimony focuses on the services performed by plaintiff and not on the benefit received by defendant. (Jones Dep. 79, 83.) The parties do not dispute the fact that QSI incurred certain expenses during the PPA bid process in promoting TaxiTronic's bid. The question is whether QSI's participation contributed to the favorable award of the PPA contract and thereby benefitted TaxiTronic. The record evidence pertaining to this question is as follows.

The RFP for the Taxicab Project "strongly encourage[d]" minority participation and James Ney, the director of the PPA's Taxicab and Limousine Division, stated that minority participation is "always a factor . . . , and it's always something that we consider." (RFP at TT119; Ney Dep. 13-14.) When TaxiTronic submitted its bid to the PPA and answered the PPA's vendor-specific questions, it represented that QSI would be involved in the Taxicab Project as a minority business partner. (TaxiTronic Proposal at Attach. B; Vendor Specific Question Responses.) QSI also participated in meetings with the PPA as TaxiTronic's prospective minority subcontractor. (Schiotis Dep. 25-26; Jones Dep. 102, 122, 128-29, 132.) At the time that the PPA conditionally awarded the Taxicab Project to TaxiTronic, QSI was TaxiTronic's stated minority business partner.

On the other hand, minority participation was a goal, not a requirement, and Ney stated that "[t]he most important criteria to me was whether they could give us everything we asked for in terms of . . . hardware, software, . . . installation, delivery, and maintenance." (Ney Dep. 18, 57-58.) Further, Ney "never knew exactly what part of the process they were going to be involved in; just that they were being introduced as someone who might be involved in the process." (Ney Dep. 35.) In the end, the PPA executed the final contract with TaxiTronic knowing that QSI was no longer involved in the project. (Ney Dep. 62.)

The evidence presently before the Court raises a genuine issue of fact on the benefit-

conferred element of unjust enrichment. Without more, however, this issue of fact is insufficient to defeat defendants' motion for summary judgment because assuming, *arguendo*, that such a benefit was received by defendants and that defendants were aware of the benefit, plaintiff has not presented any evidence that the receipt of that benefit, without compensation, is unjust.

Several courts have ruled that parties to failed contract negotiations may not rely on unjust enrichment to recover negotiation-related expenses. In such cases, each party seeks to advance its own interest in obtaining a valuable contract and any benefit conferred on the other party is incidental to that goal. Burton Imaging Grp. v. Toys "R" Us, Inc., 502 F. Supp. 2d 434, 440-41 (E.D. Pa. 2007) ("A benefit conferred is not unjustly retained if a party confers the benefit [during contract negotiations] with the hope of obtaining a contract."); see also Stendardo v. Fed'l Nat'l Mortgage Ass'n (In re Stendardo), 991 F.2d 1089, 1101 (3d Cir. 1993). This general principle is applicable in the teaming agreement context as well, where the subcontractor cannot "reasonably expect to be compensated for its pre-award services, in as much as there [is] no guarantee that [the prime contractor] would receive the [a]ward." ABT Assocs., Inc. v. JHPIEGO Corp., 104 F. Supp. 2d 523, 535 (D. Md. 2000), aff'd 9 F. App'x 172 (4th Cir. 2001) (per curiam).

In this case, the record evidence demonstrates that QSI participated in the bid process because it expected to receive a subcontract under the Taxicab Project. (Jones Dep. 79, 82-83.) This evidence does not, however, show that plaintiff reasonably expected to be compensated in the absence of a subcontract.[10] All parties who incur expenses during contract negotiations or who prepare a bid for a particular project, do so with the expectation of achieving a final

---

[10] Plaintiff alleged in its Complaint that QSI expected to be paid for services rendered during the bid process regardless of the contract award. (Compl. ¶¶ 55-56.) Plaintiff has, however, produced no evidence relating to these allegations, much less evidence which would demonstrate that such an expectation of payment would be reasonable.

contract. The activity is motivated by the party's own interest and does not imply a reasonable expectation of compensation that would make a defendant's retention of incidental benefits unjust. The fact that plaintiff's expectation grew out of a teaming agreement scenario does not materially change the analysis. See, e.g., ABT Assocs., 104 F. Supp. 2d at 535. Accordingly, the Court concludes that, based on the undisputed evidence presented by the parties, defendants were not unjustly enriched by plaintiff's efforts during the bid process.

### 2.  QSI's Implementation Plan

Plaintiff also asserts, in the Complaint, that QSI's Implementation Plan constitutes valuable intellectual property by which defendants were unjustly enriched. (Compl. ¶ 138; Jones Dep. 183-84.) Plaintiff has presented no evidence that defendants used the Implementation Plan or that the Implementation Plan otherwise benefitted the defendants. To the contrary, plaintiff's own evidence contradicts this claim. At his deposition, Jones stated that he had no basis for believing that TaxiTronic benefitted from the receipt of the Implementation Plan or used it in any way. (Jones Dep. 80-81.) Thus, plaintiff has failed to raise a genuine issue of material fact with regard to whether defendants were benefitted by the Implementation Plan, much less unjustly enriched.

### E.  Plaintiff's Unjust Enrichment Claims Against Tamam and VeriFone, Inc. in Count X

Plaintiff's Complaint also states unjust enrichment claims against defendants Tamam and VeriFone, Inc.[11] To the extent that such claims are based on a theory of imputed liability for shareholders, they are dismissed for the reasons stated in Part IV.A of this Memorandum. To the

---

[11] Tamam is simply named as a defendant to the unjust enrichment claim; there are no allegations specifically addressed to him in that Count. With regard to VeriFone, Inc., plaintiff alleges that "VeriFone, as a publicly traded company[,] can offer the news of the contract to one of its wholly owned subsidiaries [TaxiTronic] to boost its stock price on the exchanges." (Compl. ¶ 139.) However, there is no evidence of any such benefit to VeriFone, Inc.

extent that plaintiff claims that defendants Tamam and VeriFone, Inc. were personally and unjustly enriched by plaintiff's services, plaintiff has presented absolutely no evidence with regard to either defendant. Because plaintiff has failed to raise a genuine issue of material fact on this issue, the unjust enrichment claims against Tamam and VeriFone, Inc. are dismissed.

## V.  CONCLUSION

For the foregoing reasons, the Court grants defendants' Motion for Summary Judgment and enters judgment in favor of defendants, Verifone Transportation Systems, Inc., Verifone, Inc., and Amos Tamam, and against plaintiff, Quandry Solutions, Inc. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **QUANDRY SOLUTIONS INC. d/b/a QSI** | : | **CIVIL ACTION** |
| **CONSULTING,** | : | |
|    **Plaintiff,** | : | |
| | : | |
|    **v.** | : | **NO.  07-097** |
| | : | |
| **VERIFONE INC., VERIFONE** | : | |
| **TRANSPORTATION SYSTEMS INC.** | : | |
| **d/b/a TAXiTRONiC, and AMOS** | : | |
| **TAMAM,** | : | |
|    **Defendants.** | | |

---

**O R D E R**

AND NOW, this 13th day of April, 2008, upon consideration of Defendants' Motion for

Summary Judgment and Defendants' Memorandum of Law in Support of Their Motion for

Summary Judgment (Document No. 24, filed April 11, 2008); Plaintiff's Response to

Defendants' Motion for Summary Judgment and Plaintiff's Memorandum of Law in Support of

Plaintiff's Response to Defendants' Motion for Summary Judgment (Document Nos. 38-40, filed

September 2, 2008); Defendants' Reply Brief in Further Support of their Summary Judgment

Motion (Document No. 41, filed September 16, 2008); Plaintiff's Sur Reply to Defendants'

Motion for Summary Judgment (Document No. 50, filed January 19, 2009); and Defendants'

Memorandum in Response to Plaintiff's Sur Reply to Defendants' Motion for Summary

Judgment (Document No. 51, filed January 27, 2009), for the reasons set forth in the attached

Memorandum, **IT IS ORDERED** that Defendants' Motion for Summary Judgment is

**GRANTED**, and **JUDGMENT IS ENTERED** in **FAVOR** of defendants, VeriFone, Inc.,

VeriFone Transportation Systems, Inc. d/b/a TAXiTRONiC, and Amos Tamam, and **AGAINST**

plaintiff, Quandry Solutions, Inc.

**IT IS FURTHER ORDERED** that the caption of the case is **AMENDED** so as to identify defendant "VeriFone Transportation Systems, Inc." as defendant "VeriFone Transportation Systems, Inc. d/b/a TAXiTRONiC."

**BY THE COURT:**


 /s/ Hon. Jan E. DuBois                         
**JAN E. DUBOIS, J.**